UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KATHERINE JARVIS,

     Plaintiff,                     Case No: 2:21-cv-10381

v.                                Hon. Bernard A. Friedman

OAKLAND-MACOMB OBSTETRICS   Mag. Judge Elizabeth A Stafford
AND GYNECOLOGY, P.C. and
JOHN MICALLEF,

     Defendants.

| | |
|---|---|
| DARCIE R. BRAULT (P43864) | EMILY M. PETROSKI (P63336) |
| **MCKNIGHT, CANZANO, SMITH, RADTKE & BRAULT, P.C.** | FRANCESKA EDINGER (P84629) **JACKSON LEWIS P.C.** |
| 423 N. Main Street, Suite 200 | 2000 Town Center, Suite 1650 |
| Royal Oak, MI 48067 | Southfield, MI  48075 |
| (248) 354-9650 | (248) 936-1900 |
| dbrault@michworkerlaw.com | emily.petroski@jacksonlewis.com |
| *Attorneys for Plaintiff* | franceska.edinger@jacksonlewis.com |
| | *Attorneys for Defendants* |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Katherine Jarvis, ("JARVIS") as her First Amended Complaint against Oakland-Macomb Obstetrics and Gynecology, P.C. ("OMOG") and Dr. John Micallef ("MICALLEF"), by and through her attorneys, McKnight, Canzano, Smith, Radtke and Brault, P.C., states as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      JARVIS was employed as a sonographer by Defendant Oakland-Macomb Obstetrics and Gynecology, P.C. ("OMOG") and its predecessors for approximately fifteen years.

2.       JARVIS was recognized for her work ethic, positive attitude, and patient care by coworkers, management, and patients.

3.      JARVIS risked her health for the benefit of Defendants and their patients during the COVID-19 Pandemic. When she raised concerns and made complaints that Defendants' actions were a) impacting her health, b) were not compliant with the law, and c) requested that accommodations be made; Defendants disparaged, ignored, and terminated her, in violation of several laws.

4.      JARVIS alleges herein that Defendants violated the Family Medical Leave Act, 29 U.S.C. 2615(a)(1)(2) ("FMLA"), and as enhanced by the Families First Coronavirus Response Act, Publ. L. No. 116-127, 134 Stat. 178 (2020) ("FFCRA") and the Emergency Paid Sick Leave Act, 134 Stat. at 195-201 ("EPSLA"), violated the Michigan Persons with Disabilities Civil Rights Act,

MCL 37.1101, *et seq,* the Michigan's Whistleblower Protection Act (WPA), MCL 15.361, *et seq*, committed the tort of Intentional Infliction of Emotional Distress, terminated JARVIS in Violation of the Public Policy of the State of Michigan and violated the COVID-19 Employee Rights Act, MCL 419.401 *et seq*. Defendant John Micallef ("MICALLEF") is a Defendant as to each violation under which personal liability is permitted by law.

## THE PARTIES, JURISDICTION, AND VENUE

5.     JARVIS is an individual residing in Oakland County, Michigan.

6.     OMOG is, upon information and belief, a Michigan domestic professional corporation, with its principal place of business in Oakland County, Michigan.

7.     MICALLEF is an individual who resides in Oakland County and is the Chief Executive Officer for Defendant OMOG.

8.     This Court has jurisdiction of this action under 29 U.S.C. § 2617 and 28 U.S.C. §1331.

9.     This Court has supplemental jurisdiction of Plaintiff's state law claims under § 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. §1391(a) because the claims asserted arose in Oakland County, Michigan and this is also the main place of business of Defendants.

3

11.     The amount in controversy is greater than $75,000.00, exclusive of costs and interest.

## FACTS

12.     JARVIS worked for OMOG as a contract employee beginning April 24, 2006.

13.     OMOG hired JARVIS as an employee in 2016.

14.     JARVIS worked for Defendants as a sonographer, performing ultrasound imaging for OB/GYN patients from 2006 to 2020.

15.     During the time she worked for Defendants, JARVIS was often recognized for her excellent work.

16.     At all times, JARVIS met or exceeded work performance expectations.

17.     In approximately 2014 or 2015, JARVIS began to experience migraine headaches, anxiety and depression.

18.     Stress exacerbates JARVIS' migraine headaches, anxiety and depression.

19.     On March 10, 2020, the Governor of the State of Michigan issued Executive Order 2020-4, declaring a state of emergency in response to the COVID-19 pandemic.

20.    On March 20, 2020, the Governor issued EO 2020-17, which prohibited medical providers from performing nonessential procedures.

21.    On March 23, 2020, the Governor issued a "Stay Home, Stay Safe" Executive Order which required persons to shelter in place and provided for various other requirements designed to limit and prevent the spread of the novel COVID19 virus, Executive Order 2020-21.

22.    The "Stay Home, Stay Safe" order was effective March 24, 2020 and was extended in subsequent orders until June 1, 2020.

23.    On March 24, 2020, the Governor issued the first in a series of safeguards to protect workers which required social distancing and other safe practices for all employers. EO 2020-91, 97 and 114. The requirements included notice to coworkers when an employee reports a positive test for COVID, requiring leave or remote work during the CDC recommended quarantine period for employees who test positive for COVID, and the provision of appropriate protective equipment for safe work in the event in person work was required.

24.    Although the Governor subsequently lifted the ban on nonessential medical procedures, EO 2020-97 remained in effect and imposed numerous obligations on healthcare providers, including specific waiting-room procedures, limitations on the number of patient appointments, adding special hours for highly vulnerable patients, establishing enhanced telehealth and telemedicine procedures

and a preference for remote work. Subsequent Executive Orders and Department of Health and Human Services Orders continued the restrictions on healthcare providers.

25. The United States Department of Labor, Occupational Safety and Health Administration ("OSHA") also generated standards and directives to reduce employee exposure to COVID-19.

26. In late May of 2020, JARVIS was experiencing increased stress related to COVID-19, the requirement that she continue in-person work, and Defendants' failure to institute work rules, practices and protocols in accordance with the Governor's orders.

27. On May 29, 2020, JARVIS contacted her supervisor and advised that she was experiencing a disabling migraine headache and that she was unable to work.

28. Defendants accommodated her by allowing the day off.

29. On June 18, 2020, JARVIS, along with her coworkers, requested protective shields for the room in which the sonogram studies were done, in accordance with OSHA recommendations and similar to those installed in other practices.

30. Also, on June 18, 2020, JARVIS requested that the practice of limiting sonography appointments to the patient (no guests) be reinstated.

31.     On June 25, 2020, JARVIS and her coworkers raised the issue of protective shields during a staff meeting. MICALLEF rejected the request stating that the physician partners did not want shields to be installed.

32.     In rejecting the request for protective shields, MICALLEF was dismissive and angry in tone which discouraged further discussion.

33.     In July of 2020, JARVIS learned that an unidentified coworker tested positive for COVID-19.

34.     JARVIS asked if she had been in direct contact with the coworker. No response was provided by her supervisor.

35.     JARVIS had to make multiple requests to obtain the information, to learn, later, that she had, in fact, been in direct contact with the coworker.

36.     Because of the delay, JARVIS did not self-quarantine and visited with a family member.

37.     Because of the delay, JARVIS continued to report to work despite close contact with persons with a COVID-19 positive test result.

38.     In mid-July, JARVIS contacted OSHA to learn the process for filing a complaint.

39.     JARVIS advised her supervisor that she had made the inquiry and was considering filing a complaint with OSHA.

40.    JARVIS experienced increasing stress due, in part, to the Defendants' failure to take appropriate measures to keep the workplace safe, and which, in turn, exacerbated her migraines, anxiety and depression.

41.    In mid-August of 2020, JARVIS spoke to Dr. James McBride, one of Defendants' shareholders. JARVIS asked again about personal protection equipment, requested software and equipment which would allow her to do a part of her job remotely and advised that there seemed to be an increase in the number of patients she was seeing in relation to other sonographers. JARVIS also advised McBride that some construction workers remodeling the office worked without masks.

42.    It was not until September of 2020 that JARVIS was provided the requested plastic barrier, which was not fully protective, particularly with respect to observers.

43.    JARVIS purchased her own air purifier and barrier in October of 2020.

44.    In October of 2020, JARVIS and her coworkers expressed concern to OMOG that patients were allowed to have observers in the room during the ultrasound studies.

45.    JARVIS advised Defendants that other facilities and offices were prohibiting visitors in response to the escalating COVID-19 numbers.

46.     Through the fall of 2020, many patients and employees were testing positive for COVID-19.

47.     On approximately four occasions, JARVIS and her coworkers were in direct contact with patients and/or coworkers who tested positive for COVID-19 without being notified of that contact by Defendants.

48.     Defendants did not follow contact tracing protocols.

49.     Defendants did not institute sufficient screening procedures to detect COVID-19 infection in patients.

50.     On October 29, 2020, JARVIS complained that she was being scheduled for a disproportionate number of anatomy ultrasounds which increased her exposure to patients and to patient's visitors.

51.     JARVIS requested a meeting with Defendants to discuss scheduling.

52.     On November 9, 2020 and November 10, 2020, JARVIS was unable to work due to migraine headache.

53.     From May 2020 through November of 2020, JARVIS requested sick leave on multiple days for her increasingly frequent migraine headaches.

54.     On November 12, 2020, JARVIS advised Defendants, in writing, that she was having stress migraines as a result of not feeling safe at work and requested an equitable schedule regarding anatomy patients as an accommodation.

55.     On November 12, 2020, Defendants advised that they were discouraging patients from bringing anyone into appointments with them, except for ultrasound visits, for which visitors continued to be allowed.

56.     On November 16, 2020, JARVIS asked how it was safe to make an exception for ultrasounds, pointing out that guests are discouraged for appointments with the doctor that last approximately ten minutes but not for a 45 minute (plus) diagnostic ultrasound examination.

57.     On November 17, 2020, JARVIS attended a meeting with Defendants.

58.     MICALLEF immediately removed his mask when he entered the conference room.

59.     JARVIS expressed dissatisfaction with the Defendants' failure to promptly and adequately implement COVID-19 protocols designed to keep her and her coworkers safe.

60.     JARVIS stated that patients and their partner/visitors often did not observe social distancing and did not mask correctly, leaving nose and/or mouth exposed and that several patients refused to wear masks even after being asked to wear one.

61.     JARVIS complained that the practice had taken the step to limit doctor visits to the patient, only, excluding their partners, but refused to limit ultrasound examinations to patients, only.

62.     JARVIS also complained that she was receiving an inordinate number of assigned studies that permitted guests, e.g., anatomy studies.

63.     JARVIS asked that the number of assigned studies be reassigned, equitably, so that she did not receive so many anatomy studies.

64.     JARVIS asked that patients be scheduled in the same suite to mitigate potential exposure to other patients and staff.

65.     JARVIS asked that the number of assigned studies be reassigned, equitably, so that she had time between appointments to do additional cleaning and allow the room to air out.

66.     While JARVIS stated her concerns during the meeting, MICALLEF interrupted JARVIS on several occasions, was dismissive of her concerns, and used an angry tone.

67.     MICALLEF told JARVIS she was "paranoid."

68.     JARVIS advised that she felt she had to speak up for herself because she felt that Defendants did not care about her safety.

69.     MICALLEF denied her request for equity.

70.     MICALLEF advised that JARVIS was to immediately cease discussing her dissatisfaction with Defendants' protocols, describing her as "impossible to satisfy."

71.  MICALLEF created an oral warning for "unacceptable personal conduct" which allegedly took place at the meeting November 17, 2020 and placed the form in JARVIS' personnel file without providing it to JARVIS.

72.  On November 24, 2020, JARVIS was told that Defendants concluded that the employment relationship was irreparably damaged and that she was terminated.

73.  JARVIS' benefits were ended that day.

74.  JARVIS was offered two months of severance pay, but only if she would sign a release of all her legal claims against Defendants.

## COUNT I
## VIOLATIONS OF FMLA (INTERFERENCE)

75.  JARVIS incorporates by reference and realleges all the preceding allegations.

76.  Defendant OMOG qualifies as an "employer" under the FMLA, 29 U.S.C. § 2611(4).

77.  Defendant OMOG engaged in commerce or in an industry or activity affecting commerce.

78.  Defendant OMOG employed over 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year and within a 75-mile radius from the location in which JARVIS worked.

79.     Alternatively, as a result of the COVID-19 pandemic, the FMLA was expanded by to cover employers with under 50 employees for COVID-19 related purposes.

80.     JARVIS was an "eligible employee" under the FMLA because she was employed continuously by OMOG for over a twelve-month period and worked at least 1,250 hours of service in the twelve-month period prior to her need for FMLA-qualifying leave.

81.     The FMLA provides an eligible employee "a total of 12 weeks of leave during any 12-month period for ... a serious health condition that makes the employee unable to perform the functions of the position of such employee." U.S.C. § 2612(a)(1)(D).

82.     JARVIS had a right to leave under the FMLA, 29 U.S.C. § 2612(1)(D) for her migraine headaches, depression and anxiety, which are each serious health conditions within the meaning of the Act.

83.     Alternatively, JARVIS required leave for "a qualifying need related to a public health emergency," to wit, her migraine headaches, depression and anxiety, as exacerbated by the stress of the pandemic and OMOG's resistance to safety protocols. 29 U.S.C. § 2612(1)(F).

84.     OMOG unnecessarily exacerbated Plaintiff's health conditions by: (i) having a deficient or non-existent response to the COVID-19 pandemic; (ii) by

rejecting or ignoring Plaintiff's reasonable suggestions to protect against or reduce the risk of COVID-19 transmission; (iii) failing to follow industry best-practices or recommendations of Michigan or federal agencies; (iv) failing to limit the number of people attending a patient's appointment; (v) refusing to modify Plaintiff's schedule in response to her medical condition; (vi) refusing to properly notify Plaintiff of COVID 19 positive patients and coworkers with whom she had contact and (vi) responding to Plaintiff's concerns by berating or demeaning her and calling her "paranoid."

85.     JARVIS took several days of leave because of her migraine headaches, depression and anxiety.

86.     JARVIS's leave time for migraine headaches, depression and anxiety qualifies as intermittent leave under the FMLA and as modified by FFCRA and EPSLA.

87.     JARVIS followed OMOG's policy for taking leave, including providing OMOG with notice and explanation for the leave.

88.     OMOG failed to provide notices regarding FMLA-qualifying leave.

89.     An employee who returns to work within the twelve-week statutory period is entitled to return to their previous position or an equivalent position. *Id*. § 2614(a)(1).

90.     An employee entitled to FMLA leave must be restored to his or her former position or an equivalent position upon completion of leave, and "[t]he taking of leave ... shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id*. § 2614(a)(1)-(2).

91.     The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the Act. *Id*. § 2615(1).

92.     Defendant OMOG interfered with and denied JARVIS her rights under the FMLA and as enhanced by the FFCRA and the EPSLA by:

    a.   Failing to provide adequate notice of FMLA-qualifying leave;

    b.   Failing to designate JARVIS' time off for migraine headaches as intermittent leave under the FMLA;

    c.   Failing to provide JARVIS with notices of her rights under the FMLA and as enhanced by the FFCRA and the EPSLA;

    d.   Failing to return JARVIS to her pre-leave position or an equivalent one following intermittent leave;

    e.   Terminating JARVIS and canceling her health insurance benefits; and

    f.   Other violations yet to be discovered.

93.     As a direct and proximate result of Defendant OMOG's interference with her rights under the FMLA and as enhanced by the FFCRA and the EPSLA,

JARVIS has suffered damages through lost wages, salary, employment benefits and other compensation, past and future.

94.     Defendant's actions were not taken in good faith and there were no reasonable grounds for believing that its interference with JARVIS' FMLA rights were not a violation of the Act.

**WHEREFORE**, JARVIS is entitled to an award of damages, including lost compensation, past and future, liquidated damages, attorneys' fees and interest, as provided under the Act.

## COUNT II AGAINST DEFENDANT OMOG VIOLATIONS OF FMLA (DISCRIMINATION)

95.     JARVIS incorporates by reference and realleges all the preceding allegations.

96.     The FMLA prohibits discrimination (or retaliation) against an employee for having exercised or attempted to exercise FMLA rights. 29 U.S.C. § 2615(a)(2).

97.     OMOG discriminated and retaliated against JARVIS because she exercised her rights under the FMLA and opposed practices made unlawful under the FMLA, and as enhanced by the FFRCA and EPSLA by:

    a.  Deliberately exacerbating JARVIS' serious health condition by increasing stress related to COVID-19;

    b.  Deliberately exacerbating JARVIS' serious health condition by increasing JARVIS' potential exposure to COVID-19;

16

   c. Increasing JARVIS' workload;

   d. Rejecting JARVIS' good faith attempts to decrease exposure to COVID-19 in the workplace;

   e. Deliberately increasing JARVIS' exposure to COVID-19;

   f. Disparaging JARVIS as "paranoid" and "insubordinate;"

   g. Terminating JARVIS; and

   h. Other violations yet to be discovered.

98. As a direct and proximate result of Defendant OMOG's discrimination and retaliation under the FMLA, and as enhanced by the FFCRA and the EPSLA, JARVIS has suffered damages through lost wages, salary, employment benefits and other compensation, past and future.

99. Defendant's actions were not taken in good faith and there were no reasonable grounds for believing that its interference with JARVIS' FMLA rights were not a violation of the Act.

**WHEREFORE**, JARVIS is entitled to an award of damages, including lost compensation, past and future, liquidated damages, attorneys' fees and interest, as provided under the Act.

## COUNT III AGAINST ALL DEFENDANTS
## MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

100. JARVIS incorporates by reference and realleges all the preceding allegations.

101.   At all material times, JARVIS was an employee covered by and under the Persons with Disabilities Civil Rights Act, MCL 37.1201 *et seq* ("PDCRA").

102.   Defendant OMOG is an employer under the PDCRA.

103.   Defendant MICALLEF is an employer under the PDCRA because he is an agent of Defendant OMOG.

104.   JARVIS suffers a disability within the meaning of the PDCRA, to wit, chronic migraine headaches, anxiety and depression.

105.   JARVIS' disability is unrelated to her ability to perform her job duties with a reasonable accommodation.

106.   JARVIS notified Defendants of her disabilities and the need for workplace accommodations beginning in or around May 29, 2020.

107.   JARVIS requested accommodations for her chronic migraine headaches, anxiety and depression, including: intermittent sick leave, limiting the number people who could attend a patient's ultrasound appointment, providing personal protection gear or similar equipment, evenly distributing appointments among sonographers to limit exposure to COVID-19, allowing time between patients to clean, and other reasonable accommodations.

108.   DEFENDANTS denied JARVIS' requests for accommodation.

109. JARVIS' requests for time-off and other accommodations were reasonable workplace accommodations, consistent with applicable workplace laws and regulations.

110. Accommodation, as requested, did not pose an unreasonable burden on the Defendants.

111. Defendants ignored or refused the requested accommodations.

112. Defendants refused to engage in any interactive accommodation process.

113. Thereafter, Defendants retaliated against JARVIS because she requested accommodations.

114. MICALLEF stated JARVIS was "paranoid."

115. MICALLEF and principals of OMOG made additional disparaging or conclusionary statements about JARVIS' mental condition.

116. Defendants characterized JARVIS' requests for accommodation and her disappointment in Defendants' non-response or hostility toward her requests as "insubordination."

117. Defendants violated the PDCRA by:

    a. Refusing to accommodate JARVIS;

    b. Refusing to engage in an interactive accommodation process;

    c. Retaliating against JARVIS because of her requests for accommodation by increasing her workload, treating her requests

19

with hostility, refusing subsequent requests, scrutinizing her workplace interactions, disciplining and terminating JARVIS;

    d.  Discriminating against JARVIS because of her disabilities, including dismissing her requests as "paranoid" and "insubordinate," treating JARVIS differently compared to employees who are not disabled or did not request accommodation, scrutinizing her workplace interactions, disciplining and terminating JARVIS;

    e.  Deliberately increasing JARVIS's exposure to COVID-19; and

    f.  Other violations of the PDCRA yet to be discovered.

118.  As a direct and proximate result of Defendants' violation of the PDCRA, JARVIS has suffered and will in the future suffer damages including, but not limited to:

    a.   Loss of wages and earning potential,

    b.   Loss of promotional opportunities,

    c.   Loss of professional esteem and consequent damage to Plaintiff's professional career,

    d.   Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment, and

    e.   Other damages to be determined.

WHEREFORE, JARVIS prays for judgment against Defendants for whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs and attorney fees.

## COUNT IV AGAINST ALL DEFENDANTS
## MICHIGAN WHISTLEBLOWER'S PROTECTION ACT

119.    JARVIS incorporates by reference and realleges all the preceding allegations, et seq.

120.    The Michigan's Whistleblower Protection Act, MCL 15.361 *et seq,* ("WPA") prohibits retaliation against an employee who engages in protected activity under the Act.

121.    Defendants were, at all material times, an "employer" under the WPA.

122.    JARVIS was employed by Defendants withing the meaning of the WPA.

123.    JARVIS engaged in protected activity under the WPA when she threatened to report violations of the law to OSHA.

124.    Defendants violated the WPA, by:

    a.  Refusing to accommodate JARVIS;

    b.  Refusing to engage in an interactive accommodation process;

    c.  Treating her requests with hostility;

    d.  Dismissing her requests as "paranoid" and "insubordinate,"

    e.  Increasing JARVIS' workload;

    f.  Scrutinizing JARVIS' workplace interactions;

    g.  Disciplining JARVIS;

    h.  Terminating JARVIS;

    i.  Treating JARVIS differently compared to employees who did not threaten to report Defendants to OSHA;

  j. Deliberately increasing her exposure to COVID-19; and

  k. Other violations of the WPA yet to be discovered.

 125. As a direct and proximate result of Defendants' violation of the

PDCRA, JARVIS has suffered and will in the future suffer damages including, but

not limited to:

  a. Loss of wages and earning potential,

  b. Loss of promotional opportunities,

  c. Loss of professional esteem and consequent damage to Plaintiff's professional career,

  d. Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment, and

  e. Other damages to be determined.

 WHEREFORE, JARVIS prays for judgment against Defendants for whatever

amount the Court or jury determines to be fair, just, and adequate compensation for

the injuries and damages sustained, together with interest, costs and attorneys' fees.

## COUNT V AGAINST ALL DEFENDANTS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 126. JARVIS incorporates by reference and realleges all the preceding

allegations.

 127. Defendants' conduct as outlined above was extreme and outrageous.

128.   Defendants' conduct was intentional or at least reckless with respect to the harm to JARVIS.

129.   Defendants' conduct caused JARVIS to suffer severe emotional distress.

130.   As a direct and proximate result of Defendants' wrongful acts, JARVIS sustained injuries and damages including, but not limited to:

   a.  Severe emotional distress;

   b.  Exacerbation of her migraine headaches, depression and anxiety;

   c.  Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment;

   d.  Loss of professional reputation, professional esteem and consequent damage to Plaintiff's professional career;

   e.  Loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of her choice;

   f.  Loss of wages and earning potential;

   g.  Loss of promotional opportunities; and

   h.  Other damages to be determined.

**WHEREFORE** JARVIS prays for judgment against Defendants for whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs and attorneys' fees.

## <u>COUNT VI AGAINST ALL DEFENDANTS</u>

## <u>TERMINATION IN VIOLATION OF PUBLIC POLICY</u>

131.   JARVIS incorporates by reference and realleges all the preceding allegations.

132.   In Michigan, some reasons for terminating an employee are so contrary to public policy as to be actionable.

133.   JARVIS engaged in protected activity when she requested that Defendants comply with the Executive Orders and subsequent State of Michigan Health and Human Services guidance on safeguards to protect Michigan's workers from COVID-19.

134.   Defendants failed to develop a COVID-19 Preparedness and Response Plan and to make it available to employees in a timely manner.

135.   Defendants failed to train employees regarding workplace infection-control practices, the proper use of protective equipment, steps to notify the employer of COVID-19 symptoms and/or diagnosis and how to report unsafe work conditions.

136.   Defendants failed to properly screen individuals present at the workplace.

137.   Defendants failed to observe and/or enforce social distancing when possible.

138.   Defendants failed to provide appropriate barriers and equipment to minimize employee exposure.

139.   Defendants failed to observe contact tracing protocols.

140.   Defendants failed to provide time for adequate cleaning.

141.   Defendants failed to promote remote work when it was possible.

142.   Defendants failed to suspend all nonessential visitors.

143.   Defendants failed to require patients to wear a face mask.

144.   Defendants failed to limit the number of appointments to maintain social distancing and allow adequate time between appointments for cleaning.

145.   Because JARVIS sought compliance by complaining of non-compliance and requesting specific acts of compliance, Defendants took adverse action against her, including but not limited to:

  a.  Refusing to accommodate JARVIS;

  b.  Refusing to engage in an interactive accommodation process;

  c.  Treating her requests with hostility;

  d.  Dismissing her requests as "paranoid" and "insubordinate,"

  e.  Increasing JARVIS' workload;

  f.  Scrutinizing JARVIS' workplace interactions;

  g.  Disciplining JARVIS;

  h.  Terminating JARVIS;

    i.  Treating JARVIS differently compared to employees who did not engage in protected activity; and

    j.  Deliberately increasing her exposure to COVID-19.

WHEREFORE, JARVIS prays for judgment against Defendants for whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs and attorneys' fees.

### COUNT VII AGAINST ALL DEFENDANTS
### VIOLATION OF MICHIGAN EMPLOYEE RIGHTS ACT

146.   JARVIS incorporates by reference and realleges all the preceding allegations.

147.   On October 22, 2020, the Michigan legislature passed the COVID-19 Employee Rights Act, MCL 419.401 *et seq*. ("Employee Rights Act"), making it a violation for an employer to "discharge, discipline, or otherwise retaliate against an employee who does any of the following: … (b) Opposes a violation of this act" or "(c) Reports health violations related to COVID-19," MCL 419.403(1)(b)(c).

148.   The Employee Rights Act is retroactive to March 1, 2020. MCL 419.410.

149.   JARVIS engaged in protected activity under the Employee Rights Act when she opposed Defendants' failure to implement safety protocols, insisted upon compliance with the Governor's COVID-19 Executive Orders and Directives, and otherwise reported violations of the Act to Defendants.

150.   DEFENDANTS terminated JARVIS because of the aforementioned protected activity, in violation of MCL 419.403(1)(b) and (c).

151.   As a direct and proximate result of the violation of the Employee Rights Act, JARVIS has suffered damages including, but not limited to:

    a.    Loss of wages and earning potential,

    b.    Loss of employee benefits,

    c.    Loss of promotional opportunities,

    d.    Loss of professional esteem and consequent damage to Plaintiff's professional career,

    e.    Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment, and

    f.    Other damages to be determined.

WHEREFORE, JARVIS prays for judgment against Defendants for whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, punitive damages as applicable, together with interest, costs and attorney fees and such other relief as may be deemed appropriate

at the time of final judgment.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH
RADTKE & BRAULT, P.C.

By:   */s/ Darcie R. Brault*
Darcie R. Brault (P43864)
Attorneys for Plaintiff
423 N. Main Street, Suite 200
Royal Oak, MI  48067
(248) 354-9650
dbrault@michworkerlaw.com

Dated:  December 1, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2021, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system, which will

send notification of such filing to the attorneys of record.

*/s/Darcie R. Brault*
Darcie R. Brault